### L. L. LOUCKS v. PERCY K. PRIEST AND ANOTHER.[1]

April 12, 1918.

No. 20,770.

**Conspiracy — verdict not sustained by evidence.**

In this, an action to recover damages for an alleged conspiracy to injure plaintiff in his business, *held*, there was not sufficient evidence from which a reasonable inference could be drawn that the defendants or either of them had confederated against plaintiff as charged, and therefore the verdict is not sustained by the evidence.

[1]Reported in 167 N. W. 280.

Action in the district court for St. Louis county to recover $20,000 for conspiracy. The facts are stated in the opinion. The case was tried before Cant, J., who when plaintiff rested and at the close of the testimony denied defendants' motions for a directed verdict, and a jury which returned a verdict for $4,141.25. Defendants' motion for judgment notwithstanding the verdict was denied and their motion for a new trial was granted unless plaintiff consented to a reduction of the verdict by $750. From the order denying the former motion and granting the latter motion, defendants appealed. Reversed.

*Warner E. Whipple* and *Frank E. Randall,* for appellants.
*Walter F. Dacey,* for respondent.

QUINN, J.

This is an action to recover damages which plaintiff claims to have sustained as the result of an alleged conspiracy to injure him in his business. Plaintiff recovered a verdict for $4,141.25. Defendants made an alternative motion for judgment or a new trial. The motion for judgment was denied and the motion for a new trial granted, unless plaintiff would consent that the verdict be reduced $750. The consent was filed and defendants appealed.

In his complaint plaintiff alleges, in effect, that on and prior to December 13, 1916, the Service Motor Company held an agency contract for the sale of Ford cars in the city of Duluth; that thereafter the defendants, together with one H. A. Netter, who was the manager of the Duluth branch of the Ford Motor Company, wantonly and unlawfully confederated to injure him in his business and to force him out of the Service Motor Company; that in furtherance of such conspiracy they intimidated and coerced him into turning over his stock and interest in said company to the defendants at a price named by them; that, in order to compel him so to do, Netter threatened that, if plaintiff purchased the defendants' stock in the Service Company, he would terminate the Ford contract, and that he would give plaintiff until three o'clock that afternoon in which to settle his differences with the defendants and to sell his interest in the Service Company to them, and that, if it were not done by that time, he would cancel the contract and issue one to the defendants; that plaintiff did not have sufficient time in which to obtain

advice as to his rights, and that he was thereby intimidated and coerced into turning over his stock and interest in the Service company to the defendants, and to accept therefor the sum of $440; that the same was worth and of the value of $20,000, and that he thereby suffered damages in the sum of $20,000.

Brief reference to the relations and doings of the parties, leading to the matters here in issue, may be of value in considering and applying the testimony. In August, 1916, plaintiff was running a laundry in which he owned an interest, in the city of Duluth. He wanted to quit the laundry and get into the automobile business. He and several others, including the defendant O'Haire, had been trying to form a company for the purpose of handling the Ford car in Duluth, which project had fallen through. O'Haire was a stranger in Duluth where he was selling the Ford car, and plaintiff rode about with him. On one of these trips they met Priest for the first time. Priest had recently disposed of his business in North Dakota and was casting about for a new location. Plaintiff informed him of their attempt and failure to form a company to handle the Ford car. Priest became interested and the plaintiff invited him and O'Haire to his laundry to talk the matter over. They met the following evening at the laundry, which resulted in the formation of the Service Motor Company.

O'Haire was a first class salesman and thoroughly familiar with the Ford car. He had sold them under Netter at Milwaukee, and the two were close friends of long standing. Neither Priest nor the plaintiff had had any experience in the auto business or in operating cars. Both knew of the friendship between Netter and O'Haire and of the latter's ability as a salesman and car man. It was understood at the meeting in the laundry that Priest would finance the undertaking. He paid cash for his stock and loaned the plaintiff, upon his demand note, $2,000 with which to pay for his stock. In recognition of his fitness and acquaintance with the business, it was agreed that O'Haire might give his note to the company for $2,000 in payment for his stock, the note to be paid from his share of the profits. Each was to give his time and business efforts to the business and receive a salary of $125 per month. Forty shares of its capital stock of the par value of $50 each were issued to each of the parties to this action, pursuant to the arrangement stated. Loucks be-

came president, O'Haire, vice president, and Priest, secretary and treasurer.

Thus organized and with a paid in capital of $4,000 the company obtained a contract from the Ford Motor Company to sell 300 of its cars to residents of, and for use only within the city limits of Duluth, upon a commission of 15 per cent of the list price thereof. The contract also provided that the Service Company should purchase from the Ford company on its own account a stock of Ford parts, to inventory at all times at not less than $2,000, upon which the gross profits would be 25 per cent. The contract was to continue in force until July 31, 1917, and contained the following provision:

"This contract shall continue in force and govern all transactions between the parties until July 31, 1917, but it is agreed that either party shall be at liberty, with or without cause, to cancel and annul this contract at any time upon written notice by registered mail to the other party and such cancelation shall also operate as a cancelation of all orders for automobiles, chassis, automobile parts, accessories or attachments which may have been received by the first party from the second party prior to the date when such cancelation takes effect."

Plaintiff testified at the trial that he told Mr. Priest at the laundry meeting that he would like to dispose of his laundry in order to raise the money for his stock; that Priest replied, "If your laundry looks that you can make something out of it, I suggest you keep your laundry;" that he did keep the laundry for about a month or six weeks after they got under way, and that he had continual calls from the laundry; that one day Mr. Priest suggested: "I think you ought to sell that laundry. You can afford to devote all your entire time right here to this agency business." Plaintiff sold to Mr. Lutes the first chance he got. He did not get nearly the money he expected to get out of it, but was anxious to sell quickly and get rid of it. He realized $1,000 for himself and applied it on the $2,000 Priest had loaned him on his stock.

The plaintiff had several accidents in which the cars he used were considerably damaged. Discord followed. On December 13 he had another accident with a sedan car. He left the car by the car track where the accident occurred. That evening O'Haire brought the car in. He was outspoken with dissatisfaction, offered to step out and quit the com-

pany if they would take his name off the paper. He maintained this attitude to the end. Priest stated that he would not remain in the company if O'Haire quit, and requested the bookkeeper to prepare a statement of the company's affairs. It appeared that there had been a loss of $350 in the business. The plaintiff claims that at this time Priest offered to give him $500 for his interest or to take the amount he had paid in and step out; that he arranged for the money and informed Priest that he was ready to buy him out when Priest told him he had changed his mind. Priest admitted offering plaintiff $500 for his interest, but denied any offer on his part to sell. The trouble had become public and was the talk of the employees about the place. Netter was familiar with the situation. It had been his habit to visit the Service Company's place of business almost daily. He had talked with all the parties about the lack of harmony. On the afternoon of December 20, plaintiff went to Netter's office to learn whether Netter would consent to turn over the Ford contract to him in case he arranged with his associates. Netter told Loucks that he lacked the necessary experience to handle so large a contract, and that the Ford Company would not consent to it. Netter then called the defendants by 'phone and asked them to bring the contract to his office. They asked for a little time as they were busy, but Netter insisted and they complied with his request. When the defendants arrived Netter stated to them and to the plaintiff that he considered that the interests of the Ford Company were being affected by the dissension; that he had determined to cancel their contract unless they would iron out their differences, and that he would give them until three o'clock that afternoon in which to do so. After some talk Priest offered to take the plaintiff's stock and pay him therefor the amount which he had paid thereon less the damages to the cars caused by the plaintiff, and to return his note. The plaintiff accepted the offer, Priest gave him a check for $437.25, which he had cashed, and two or three days later plaintiff resigned from the offices of president and director of the company.

We have then the question: Does it appear from the testimony that the plaintiff was forced to dispose of his interest in the company and retire therefrom as the result of a conspiracy on the part of the defendants, as charged in the complaint? In determining this question the

plaintiff is entitled to the most favorable inference that may, in reason, be drawn from the testimony, the verdict being in his favor. The plaintiff testified, and it is not disputed, that prior to the accident to the sedan car affairs had moved along without serious friction of any kind. When plaintiff met with that accident he left the damaged automobile at the car track. O'Haire brought it in. He was outspoken with dissatisfaction, offered to quit the company if they would take his name off the paper. He maintained this attitude to the end, admitted his friendly relations with Netter and that they had frequent interviews concerning the business, but he denied emphatically ever having said a word to Netter about getting the plaintiff out of the Service Company. Netter testified that he and O'Haire had been friends for many years; that he wanted to see O'Haire successful and that he would help him where he could; that they had had frequent interviews the same as he had had with the plaintiff and Mr. Priest during the time they were in business together. He denied that he had ever had any understanding with O'Haire or Priest about getting the plaintiff out of the company; that, at the time he called the defendants over to his office, neither of them knew of his purpose for so doing; that, when he stated to the plaintiff and the defendants that he had determined to terminate their contract unless they straightened out their differences, he did so for the good of his company and for no other purpose. Priest testified that it was Netter's custom to visit their place of business almost daily; that he had frequently conversed with each of them about the business, but that there was no talk nor understanding between them relative to getting the plaintiff to quit the business.

It is conclusive that the trouble grew out of the plaintiff's unfortunate experiences in handling cars. There is no proof in the case of any other cause. No trouble nor ill-feeling can be attributed to the sale of the laundry. Priest had financed the undertaking as agreed upon. O'Haire was taken into the company largely because of friendly relations with Netter. The plaintiff told Netter that he was willing to take his chances in the business if he could obtain defendants' interest and hold the agency contract, even though the company gave another contract to O'Haire. Nothing appears more certain in the case than that Netter is an impulsive individual. Whether he gave the parties a reasonable

length of time in which to adjust their differences is not, of itself, any proof that the defendants confederated against the plaintiff; and, under the circumstances, considering the relations of the parties, it cannot be said that an inference of guilt may be drawn from the fact that Netter had frequent interviews with the defendants. He was on friendly terms with all the parties. Each was interested in the success of the business, and his daily calls had continued from the time the company first began business. We are satisfied that there is not sufficient evidence in the case from which a reasonable inference may be drawn that the defendants confederated against the plaintiff as charged in the complaint.

The gist of the action is damages, not the conspiracy. The termination of the contract would have taken from the Service Company the right to sell the Ford car in the city of Duluth. It would neither have dissolved the Service Company nor expelled the plaintiff therefrom. Either party to the agency contract had the right to terminate it at any time with or without cause. Seven months of the period covered by the contract remained. Sixty of the 300 cars had been sold and there had been a loss in the business. The Ford Company had the right to place as many agencies in the city as it chose. There were other agencies in the city at the time, just how many does not appear. The Service Company was to receive a 15 per cent commission for selling the cars according to price list, but there is no proof of what that price list was. These matters might have a bearing on the profits to be derived from the business. The plaintiff alleged that his interest in the Service Company was of the value of $20,000, and asked damages in that amount. We are unable to find any competent evidence sufficient to justify the amount of the verdict. There was no proper foundation laid for the testimony of the witness Foster upon the question of damages and the objection thereto should have been sustained. Under this view of the case no particular good will be accomplished by a further discussion of appellant's assignments of error. The order appealed from is reversed.